IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Eugene A. Gardner, III, #357996,   )
         )    Civil Action No. 2:16-cv-03547-BHH-MGB
      Plaintiff,   )
         )
v.         )    **REPORT AND RECOMMENDATION**
         )    **OF MAGISTRATE JUDGE**
         )
Officer Dial, *Darlington County Detention*  )
*Center*; and Warden Coe, *Darlington*  )
*County Detention Center*,   )
         )
      Defendants.   )
         )

The Plaintiff, proceeding *pro se* and *in forma pauperis*, brought this action pursuant to Title 42, United States Code, Section 1983 and South Carolina state law. This matter is before the Court upon a Motion for Summary Judgment filed by Defendant Warden Coe ("Coe"). (*See* Dkt. No. 23.)[1] For the reasons set forth herein, the undersigned recommends granting Defendant Coe's motion.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(e), D.S.C., all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.

The Plaintiff brought the instant action against Defendant Coe and Officer Dial, both of the Darlington County Detention Center, on or about October 27, 2016. (*See generally* Dkt. No. 1.) On February 17, 2017, Defendant Coe filed a Motion for Summary Judgment. (*See* Dkt. No. 23.) By order filed February 17, 2017, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the Plaintiff was advised of the summary judgment procedure and the possible consequences if he failed to adequately respond to the motion. (Dkt. No. 24.) On or about February 28, 2017, Plaintiff filed a Response in Opposition to Coe's Motion for Summary Judgment. (*See* Dkt. No. 26.)

---

[1]Defendant Dial's Motion to Dismiss is also pending. (*See* Dkt. No. 28.) That motion will be addressed separately.

**BACKGROUND**

The incidents giving rise to the instant action occurred on or about November 15, 2013, while Plaintiff was a pretrial detainee at the Darlington County Detention Center. (*See generally* Dkt. No. 1; *see also* Dkt. No. 1-3 at 7 of 15.) Plaintiff alleges that Defendant Dial had damaged some "radios and equipment" that belonged to Plaintiff's roommate, Edward Winburn, and others. (*See* Dkt. No. 1 at 1 of 4.) According to Plaintiff, Defendant Coe "was told about this and agreed it was wrong." (*Id.*) Plaintiff alleges that Defendant Dial and Winburn "were arguing about what Dial did at [Plaintiff's and Winburn's] door," and Sergeant Byrd "came to see what was wrong." (*Id.*) Plaintiff states, "Dial snatched the keys from Byrd, opened our door and challenged and threatened Winburn to come out of our room." (*Id.*) Plaintiff alleges he "tried to control the situation" and stopped Winburn twice from going to meet Dial's challenges. (Dkt. No. 1 at 1-2 of 4.) According to Plaintiff, "Sgt. Byrd told Dial to back down[,]" and "Byrd then took the keys back from Dial and it was over." (Dkt. No. 1 at 2 of 4.)

Plaintiff alleges later that day "and for a few days afterward," Dial came to Plaintiff's dorm "making negative comments and staring at [Plaintiff's and Winburn's] door." (*Id.*) Plaintiff states,

> I wrote a grievance for Winburn against Dial. Winburn said he did not know how to put the grievance into words. It was wrong what Dial did and even other officers and Captain Coe agreed. Captain Coe came to our room and we told him that Dial was making threats and that he was going to start trouble. Guys were saying that Dial was doing drugs. Captain Coe said that he would take care of this situation. We even told him other officers were complaining about Dial's behavior. Coe did nothing!

(Dkt. No. 1 at 2 of 4.) According to Plaintiff, Dial had previously been "suspended for spitting in a man's face[,]" but Dial "later was back working." (*Id.*)

Plaintiff alleges that around 7PM the night that they "told Captain Coe that morning," Defendant Dial "came into [Plaintiff's] pod to relieve Officer Edmond[, and] Dial came out and gave a big speech." (Dkt. No. 1 at 2-3 of 4.) Plaintiff asserts that Defendant Dial "said he knew who wrote the grievance and how mad he was" and that "he would '"f..k" an inmate up, 'this job is not

important enough to [him] anyway.'" (*Id*. at 2 of 4.) According to Plaintiff, Officer Edmond told him that "Dial came to [Plaintiff's] pod to relieve him on purpose" because Dial knew Plaintiff wrote the grievance. (*Id*.) Plaintiff further alleges as follows:

> Dial stated the rules and when he was finished I started towards the phone. Dial came up to me and asked if I had a problem with him. I said no Dial and that I had to use the phone. He told me to go to my room. I told Dial that I had not done anything and that I needed to use the phone. He said for me to go to my room. I told him I had not done anything wrong and that I needed to use the phone. He stepped back and said, "go to your room." I turned to my left and he had pulled his taze [sic] gun [out]. He shot me in my right chest and rib cage. I fell and told him to stop and that my chest was burning. (I had open heart surgery prior to all of this. My attorney . . . had my medical records sent to the facility's medical department. They all knew not to taze me. I was even in a handicapped room, because of my breathing machine.)

(*Id*. at 2 of 4.)

According to Plaintiff, around 2AM that night, Officers Edmond and Collier took him to lockup. (*Id*. at 3 of 4.) Plaintiff asserts that he asked why he was being taken to lockup and said that he "had done nothing wrong." (*Id*.) Plaintiff alleges the officers "said they were told they had to do this, but did not know why" and that the officers apologized to Plaintiff. (*Id*.) Plaintiff further alleges as follows:

> I went to lockup: "another form of punishment." It was freezing cold, they take your mattress and blanket at 6AM and return it at 10PM, "everyday." Lockup should be punishment enough. I was a pretrial detainee, [had] a heart condition, a breathing machine (that I did not have at lockup), officers telling me all of this was wrong.

(*Id*.) Plaintiff asserts that Defendant Dial was "fired because of what he did to [Plaintiff] and he had tested positive for cocaine." (*Id*.)

Plaintiff alleges that Defendant Coe "knew before the tazing that Dial was making threats and that he might be doing drugs." (*Id*.) Plaintiff states,

> Coe said he would take care of my concerns and complaints about Dial and his actions and threats. If Coe would have looked into this and t[aken] the proper actions I would have never been tazed. Officer Dial knew about my health conditions and tazed me anyway. Coe knew also. [Dial] deliberately tazed me with no concerns for my health and wellbeing and Coe knew before the incident and did nothing. (Deliberate indifference and negligence).

(*Id*.) Plaintiff contends he "stayed in lockup for 2 weeks until [his criminal] trial." (*Id*.)

Plaintiff states that he is asserting two causes of action; the first is for violations of 42 U.S.C. § 1983; in the second, he asserts that the Defendants "violated state laws and Darlington County Detention Center Regulations." (Dkt. No. 1 at 3-4 of 4.) He seeks compensatory and punitive damages. (*Id*. at 4 of 4.)

## STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id*. (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

## DISCUSSION

Defendant Coe presents several arguments in support of his Motion for Summary Judgment. (*See generally* Dkt. No. 23-1.) Coe argues, *inter alia*, that the "alleged actions/inactions claimed by Plaintiff do not rise to the level of a constitutional violation." (Dkt. No. 23-1 at 4.) Coe also argues that Plaintiff "cannot recover against Coe under any theory of vicarious liability, respondeat superior, or supervisory liability." (*Id*. at 6.) He contends he is entitled to summary judgment "on any claims of the Plaintiff construed as state claims" and that he is entitled to immunity on state law claims pursuant to the South Carolina Tort Claims Act. (*Id*. at 11-12.) Defendant Coe further asserts he is entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies. (*Id*. at 12.)

The undersigned recommends granting summary judgment to Defendant Coe as to Plaintiff's § 1983 claim.[2] Plaintiff's claim against Coe is that Coe was allegedly aware of "threats" made by Officer Dial, and Coe did not take action on that alleged knowledge, thereby resulting in Plaintiff being tased by Dial. (*See* Dkt. No. 1; Dkt. No. 1-3.)[3] To the extent Plaintiff asserts that Defendant Coe was negligent, such a claim is not actionable pursuant to § 1983. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Pink v. Lester*, 52 F.3d 73, 78 (4th Cir. 1995) ("The district court properly held that *Daniels* bars an action under § 1983 for negligent conduct. . . . ").

Moreover, the doctrines of vicarious liability and *respondeat superior* are generally not applicable in § 1983 actions. *Vinnedge v. Gibbs*, 550 F.2d 926, 927-29 (4th Cir. 1977); *see also Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978) (holding "that a municipality cannot be held liable *solely* because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"). However, "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984). In such a case, liability "is not premised on *respondeat superior*, but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.* (citations omitted).

The Fourth Circuit has set forth three elements "necessary to establish supervisory liability under § 1983":

---

[2]In the instant action, it is undisputed that Plaintiff did not exhaust his administrative remedies. (*See* Coe Aff. ¶¶ 4-5; *see also* Dkt. No. 1-3 at 9 of 15.) However, because Plaintiff asserted that was not able to use the kiosk to submit a grievance, (*see* Dkt. No. 26 at 3, 7 of 11), the undersigned does not recommend summary judgment due to failure to exhaust. *See Moore v. Bennette*, 517 F.3d 717, 725 (2008) ("[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it"). This is not to say that Plaintiff's failure to exhaust would ultimately be excused, only that there appears to be a genuine issue of material fact as to whether administrative remedies were "available" to Plaintiff. *See* 42 U.S.C. § 1997e(a).

[3]In his Response in Opposition to Defendant Coe's Motion for Summary Judgment, Plaintiff elaborates, stating that he "told Coe that Dial was going to hurt someone and that [Dial] was said to be doing drugs." (Dkt. No. 26 at 3 of 11.)

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks and citations omitted). To satisfy the first element, a plaintiff must show the following: "(1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Id*. (citing *Slakan*, 737 F.2d at 373). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id*. (citing *Slakan*, 737 F.2d at 373-74).

Here, even accepting Plaintiff's allegations as true, Plaintiff's attempt to hold Defendant Coe responsible for Dial's use of the taser on Plaintiff fails. *Shaw v. Stroud*, 13 F.3d 791, is instructive as to what conduct poses a pervasive and unreasonable risk of constitutional injury to a plaintiff. The *Shaw* case involved a § 1983 claim "against a North Carolina state trooper and several of his supervisors by the wife and minor children of a citizen the trooper shot and killed during an arrest." *Shaw*, 13 F.3d at 793-94. The Fourth Circuit concluded the plaintiffs had presented evidence of each element required to establish supervisory liability on the part of Sergeant Stroud, who supervised Officer Morris. *Id*. at 799-800.

The evidence at issue in *Shaw* is much different from the allegations Plaintiff makes against Defendant Coe. The record in *Shaw* contained evidence that in May of 1987, Morris allegedly beat an arrestee named Walker; when Walker told Stroud he wanted to discuss the way Morris had treated him, "Stroud responded, 'Oh, what happened, he roughed you up?'" *Id*. at 795. Also in May of 1987, an arrestee named Menser reported Morris for assault, though "an investigation cleared Morris of the charges." *Id*. In March of 1988, Morris allegedly assaulted an arrestee named James; according to James, he saw Stroud when Morris took him to jail, and "Stroud commented to Morris, 'You got

another one.'" *Id*. James asserted that Stroud and Morris laughed, and Stroud "refused to listen . . . when [James] tried to tell Stroud that Morris had beaten him." *Id*. In July of 1988, Ms. Cothran called the State Highway Patrol Internal Affairs Department to "report that Morris [and another trooper] . . . had assaulted her son." *Id*. "From September 1987 to December 1988, during Stroud's tenure, six of the nine charges of assault on a law enforcement officer in [the county] . . . were brought by Morris. There were forty-six charges for resisting arrest, twenty of which were initiated by Morris." *Id*. at 795-96.

In affirming the district court's denial of Stroud's motion for summary judgment, the Fourth Circuit stated, *inter alia*,

> Stroud argues that the plaintiffs have failed to establish each element required for supervisory liability on his part. Stroud first contends that the plaintiffs have not shown that Stroud knew of conduct by Morris which posed a pervasive and unreasonable risk of harm to citizens like Bowen. We disagree. As discussed more fully below, Stroud had knowledge of at least three incidents in which Morris used excessive force which posed an unreasonable risk of harm to arrestees.
> Next, Stroud argues that he exhibited no deliberate indifference. The plaintiffs, however, have presented more than an isolated incident suggesting Stroud's deliberate indifference to or implicit authorization of Morris' abusive conduct. Three separate witnesses have alleged that, when they notified Stroud of assaults by Morris, he responded callously and with apparent amusement. For instance, Stroud never bothered to return Harvey Paul Walker's phone calls although he knew that Morris had possibly "roughed up" Walker. In addition, Stroud just "sort of smiled" at Gary Ward when Ward reported Morris' violent conduct to Stroud. Besides laughing when Morris escorted Jessie James to the jail, Stroud refused to listen to James when he tried to report that Morris had beaten him. Finally, the statistical evidence speaks for itself: during Stroud's tenure as First Sergeant of Troop B–V (two line sergeants and twenty troopers), Morris instituted twenty-six of the fifty-five charges of assault on a law enforcement officer and resisting/delaying/obstructing an officer. Under these circumstances, Stroud's inaction raises genuine issues of material fact as to whether he was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.

*Shaw*, 13 F.3d at 799-800 (internal quotation marks and citation omitted).

In the case *sub judice*, Plaintiff alleges that he told Defendant Coe that "Dial was making threats and that [Dial] was going to start trouble." (Dkt. No. 1 at 2 of 4.) Allegations that Plaintiff complained--one time--that Dial was "doing drugs," was "making threats," and was "going to start

trouble"--do not, in the opinion of the undersigned, rise to the level of a "pervasive and unreasonable risk of constitutional injury." *See Shaw*, 13 F.3d at 799 ("Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." (citing *Slakan v. Porter*, 737 F.2d 368, 373-74 (4th Cir. 1984))); *Slakan*, 737 F.2d at 373 (noting the plaintiff in a supervisory liability case "assumes a heavy burden of proof" and "[o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents" (citations omitted)). Accordingly, the undersigned recommends granting summary judgment to Defendant Coe as to Plaintiff's § 1983 claim. *See Shaw*, 13 F.3d 791; *cf. Strickland v. Halsey*, 638 F. App'x 179, 185 (4th Cir. 2015) (officers were not deliberately indifferent where they "knew that [inmate] Gleason had killed in the past and that he threatened to kill again," stating that "mere knowledge of [inmate] Gleason's threats" do not "rise[] to the level of deliberate indifference"); *Lewis v. Cunningham*, 483 F. App'x 617, 619 (2d Cir. 2012) ("[A] vague complaint is insufficient to permit a jury to find that a prison official's failure to act in response was deliberate indifference.").[4]

The undersigned further recommends granting summary judgment to Defendant Coe as to Plaintiff's state-law claim. The South Carolina Tort Claims Act provides the "exclusive remedy for any tort committed by an employee of a governmental entity." S.C. CODE ANN. § 15-78-70(a). Pursuant to this Act, an employee of a governmental entity who commits a tort while acting within the scope of his official duty is generally immune from liability for that tort; however, an employee is not entitled to immunity if it is proven that the employee's conduct "was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. CODE ANN. § 15-78-70(b). Plaintiff's state law claim against Defendant Coe is governed by the South Carolina Tort Claims Act. *See* S.C. CODE ANN. § 15-78-

---

[4]Additionally, to the extent Plaintiff alleges that Defendant Coe failed to follow the policies and procedures of the Darlington County Detention Center, this allegation, in itself, does not give rise to a § 1983 claim. *See United States v. Caceres*, 440 U.S. 741 (1978); *see also Riccio v. Cnty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir.1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue."); *Keeler v. Pea*, 782 F.Supp. 42, 44 (D.S.C. 1992) (violations of prison policies which fail to reach the level of a constitutional violation are not actionable under § 1983).

30(d) (defining "governmental entity" as "the State and its political subdivisions"); S.C. CODE ANN. § 15-78-30(h) (defining "political subdivision" to include counties and municipalities); *Jinks v. Richland Cnty.*, 355 S.C. 341, 585 S.E.2d 281 (2003) (affirming jury verdict in favor of the plaintiff, who brought wrongful death and survival action pursuant to the South Carolina Tort Claims Act, on behalf of her husband who died while incarcerated at the defendant Richland County's Detention Center); *Stepheny v. Lott*, Civ. A. No. 805-2740-MBS, 2006 WL 4529875, at *7 (D.S.C. May 8, 2016) (noting that the plaintiff's claim was "cognizable under the South Carolina Tort Claims Act because the Alvin S. Glenn Detention Center is operated by a political subdivision of the State of South Carolina").

However, Plaintiff's state law claim against Defendant Coe fails because Defendant Coe's alleged conduct does not rise to the level of "actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. CODE ANN. § 15-78-70(b). Plaintiff's claim against Coe is that Coe was allegedly aware of "threats" made by Officer Dial, and Coe did not take action on that alleged knowledge quickly enough, thereby resulting in Plaintiff being tased by Dial. (*See* Dkt. No. 1; Dkt. No. 1-3.) Such a claim against Coe is, at best, a claim for negligence. (*See generally* Dkt. No. 1; Dkt. No. 1-3.)[5] The undersigned therefore recommends granting summary judgment to Defendant Coe as to Plaintiff's state law claim. *See* S.C. CODE ANN. § 15-78-70(b) (noting that the South Carolina Tort Claims Act does not "give an employee of a governmental entity immunity from suit and liability if it is proved that the employee's conduct . . . constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude"); *Faile v. S.C. Dep't of Juvenile Justice*, 350 S.C. 315, 321 n.1, 566 S.E.2d 536, 539 n.1 (2002) ("When a plaintiff claims an employee of a state agency acted negligently in the performance of his job, the South Carolina Tort Claims Act requires a plaintiff to sue the agency for which an employee works, rather than suing the employee directly." (citing S.C. CODE ANN. § 15-78-70(c))); *Flateau v. Harrelson*, 355 S.C. 197, 208, 584 S.E.2d 413,

_____

[5]As noted above, in his Response in Opposition to Defendant Coe's Motion for Summary Judgment, Plaintiff asserts that he "told Coe that Dial was going to hurt someone and that [Dial] was said to be doing drugs." (Dkt. No. 26 at 3 of 11.)

419 (Ct. App. 2003) (affirming dismissal of the plaintiffs' actions where the plaintiffs named individuals as defendants, and "§ 15-78-70(c) placed no burden on the [defendants] to substitute the Commission's name for their names as a party defendant"); *Weatherall v. Fox*, Civ. A. No. 2:15-2668-RMG, 2016 WL 3035252, at *5-6 (D.S.C. Apr. 14, 2016), *adopted at* 2016 WL 3041860 (May 27, 2016) (concluding that the plaintiff's claim against the defendant as "Director" of the detention center failed because "he is not a proper party" pursuant to the South Carolina Tort Claims Act where the plaintiff alleged the defendant was negligent in failing "to provide adequate staff and training, fail[ing] to carry out his responsibilities, fail[ing] to remedy the Plaintiff's condition, and maintain[ing] policies that interfered with adequate medical care").

## **CONCLUSION**

Wherefore, it is RECOMMENDED that Defendant Warden Coe's Motion for Summary Judgment (Dkt. No. 23) be GRANTED.

IT IS SO RECOMMENDED.

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

August 3, 2017
Charleston, South Carolina

**The parties' attention is directed to the important notice on the next page.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).